Elizabeth A. Fegan
HAGENS BERMAN SOBOL SHAPIRO LLP
1144 W. Lake Street, Suite 400
Oak Park, IL 60301
Telephone: (708) 628-4949
Facsimile: (708) 628-4950
beth@hbsslaw.com

Steve W. Berman
Karl P. Barth
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone: (206) 623-7292
Facsimile: (206) 623-0594
steve@hbsslaw.com
karlb@hbsslaw.com

*Counsel for Plaintiffs and the Proposed Class*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| BRIAN McCORMICK and VITO SPILLONE, individually and on behalf of all others similarly situated,<br><br>           Plaintiffs,<br><br> v.<br><br>BANK OF AMERICA CORPORATION; BARCLAYS BANK PLC; CITIBANK, NA; CREDIT SUISSE GROUP, NA; DEUTSCHE BANK AG; HBOS plc; HSBC HOLDINGS PLC; J.P. MORGAN CHASE & CO.; LLOYDS BANKING GROUP PLC; RABOBANK GROUP; THE ROYAL BANK OF SCOTLAND GROUP PLC; UBS AG; and WESTLB AG,<br><br>           Defendants. | No.<br><br>CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE COMMODITY EXCHANGE ACT AND THE FEDERAL ANTITRUST LAWS<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs, as defined below, allege the following upon personal knowledge as to themselves and their own acts and upon information and belief as to all other matters. Plaintiffs' information and belief is based on the investigation of its counsel. The investigation included, for example: (i) review and analysis of LIBOR rates and the differences therefrom of similar interest rates; (ii) review and analysis of court filings of other cases; and (iii) review and analysis

of media reports; and (iv) additional materials. Many of the facts related to Plaintiffs allegations are known only by the Defendants named herein, or are exclusively within their custody or control. Plaintiffs believe that substantial additional evidentiary support for the allegations set forth below will be developed after a reasonable opportunity for discovery.

## I. SUMMARY OF THE ACTION

1. This case is brought to recover for the injuries sustained by Plaintiffs and the members of the Plaintiff Class as a result of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1, and seeks treble damages, injunctive relief, costs of suit, and reasonable attorneys' fees pursuant to Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26 and Rule 23 of the Federal Rules of Civil Procedure. This case also brings claims under the Commodity Exchange Act, 7 U.S.C. § 1, *et seq.* The Plaintiff Class, defined more fully below, consists of all persons and entities that purchased or sold Exchange Traded LIBOR-Based Derivatives during the period from January 1, 2006, through December 31, 2009.[1]

2. Throughout the Class Period, the Defendants conspired to artificially suppress the reported LIBOR rate, which is the baseline interest rate used in the valuation of more than $300 trillion in derivative financial products, including the Exchange Traded LIBOR-Based Derivatives that are at issue in this case.

3. Although, as the Defendants were fully aware, LIBOR is the most important interest rate calculation in the world, with trillions of dollars of loans and other financial products directly tied to it, the rate is set by subjective responses submitted by a handful of multinational banks (the Defendants) that had a strong incentive to manipulate the rate of LIBOR downward.

4. As numerous academic studies and investigative reports from the WALL STREET JOURNAL demonstrate, the Defendants did bow to these incentives and conspired to set the price of LIBOR at an artificially low level for their own selfish reasons, knowing full well that this manipulation would have disastrous ramifications for the multitude of persons in the United

---

[1] Exchange Traded LIBOR-Based Derivatives include: CME 1-month and 3-month Eurodollar futures and options contracts; CBOT mini-sized Eurodollar futures and options contracts; and CBOT 5-year, 7-year, 10-year and 30-year Interest Rate Swap futures and options contracts.

States, including the Class Members of this case, who suffered damages when the value of their Exchange Traded LIBOR-Based Derivatives suffered because of inaccurate LIBOR presentations that were engineered by the Defendants.

## II. JURISDICTION AND VENUE

5. This action is instituted under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§15 and 26, to recover treble damages, and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiffs and the members of the Plaintiff Class by virtue of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. §1, and to enjoin further violations.

6. This Court has jurisdiction under 28 U.S.C. §§ 1331, 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15(a) and 26, and Section 22 of the Commodity Exchange Act ("CEA"), 7 U.S.C. § 25 and 28 U.S.C. §§ 1331 and 1337.

7. Venue is appropriate in this District under Sections 4, 12, and 16 of the Clayton Act, 15 U.S.C. §§ 15, 22 and 26, Section 22 of the CEA, 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b), (c) and (d), because during the Class Period the Defendants resided or transacted business in this District, and because a substantial portion of the affected interstate commerce described herein was carried out in this District.

8. The activities of the Defendants and their co-conspirators, as described herein, were within the flow of, were intended to, and did have direct, substantial and reasonably foreseeable effects on the foreign and interstate commerce of the United States.

## III. THE PARTIES

### A. Plaintiffs

9. Plaintiff Brian McCormick purchased and sold Exchange Traded LIBOR-based Derivatives, including CME Eurodollar futures contracts, during the Class Period, and was thereby damaged by Defendants' conduct as alleged herein.

10. Plaintiff Vito Spillone purchased and sold Exchange Traded LIBOR-based Derivatives, including CME Eurodollar futures contracts, during the Class Period, and was thereby damaged by Defendants' conduct as alleged herein.

**B.     Defendants**

11. Defendant Bank of America Corporation ("BofA") is a Delaware Corporation headquartered in Charlotte, North Carolina. Defendant Bank of America has numerous offices within this judicial district. At all relevant times, Defendant BofA was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

12. Defendant Barclays Bank plc ("Barclays") is a United Kingdom public limited company headquartered in London, England. At all relevant times, Defendant Barclays was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

13. Defendant Citibank NA ("Citibank") is a wholly-owned subsidiary of Citigroup, Inc., a Delaware corporation headquartered in New York, New York. Defendant Citibank has numerous offices within this judicial District. At all relevant times, Defendant Citibank was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

14. Defendant Credit Suisse Group AG ("Credit Suisse") is a company formed under the laws of Switzerland, with its headquarters in Zurich, Switzerland. Defendant Credit Suisse has at least three offices within this judicial district – one in Northbrook and two in Chicago. At all relevant times, Defendant Credit Suisse was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

15. Defendant Deutsche Bank ("Deutsche") is a German financial services company headquartered in Frankfurt, Germany. Defendant Deutsche Bank has offices within this judicial District at 222 South Riverside Plaza, Chicago, IL 60606. At all relevant times, Defendant Deutsche was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

16. Defendant HBOS PLC ("HBOS") is a banking and insurance company headquartered in Edinburgh, Scotland. Through an acquisition in 2009, HBOS is now a wholly

owned subsidiary of Lloyds Banking Group PLC. At all relevant times, Defendant HBOS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

17. Defendant HSBC Holdings plc ("HSBC") is a United Kingdom public limited company headquartered in London, England. Defendant HSBC has offices within this judicial district at 71 S. Wacker Drive, Suite 2700, Chicago, Illinois 60606. At all relevant times, Defendant HSBC was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

18. Defendant J.P. Morgan Chase & Co. ("J.P. Morgan Chase") is a financial holding company formed under the laws of Delaware, and headquartered in New York, New York. Defendant J.P. Morgan Chase has numerous offices within this judicial district. At all relevant times, Defendant J.P. Morgan Chase was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

19. Defendant Lloyds Banking Group PLC ("Lloyds") is a United Kingdom public limited company headquartered in London, England. At all relevant times, Defendant Lloyds was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

20. Defendant Rabobank Group ("Rabobank") is a financial services provider with its headquarters in Utrecht, the Netherlands. Defendant Rabobank has offices within this judicial district at 123 N. Wacker Drive, Suite 2100, Chicago, Illinois 60606. At all relevant times, Defendant Rabobank was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

21. Defendant Royal Bank of Scotland Group PLC ("RBS") is a United Kingdom public limited company headquartered in Edinburgh, Scotland. Defendant RBS has offices within this judicial District at 71 South Wacker Drive, 28th Floor, Chicago, IL 60606. At all relevant times, Defendant RBS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

22. Defendant UBS AG ("UBS") is a Swiss company based in Basel and Zurich, Switzerland. Defendant UBS has offices within this judicial District at 1 North Wacker Drive,

Chicago, IL. At all relevant times, Defendant UBS was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

23. Defendant WestLB AG ("WestLB") is a German joint stock company headquartered in Dusseldorf, Germany. Defendant WestLB has offices within this judicial District at 10 South Wacker Drive, Suite 2960, Chicago, IL 60606. At all relevant times, Defendant WestLB was a contributing member of the British Bankers' Association U.S. Dollar LIBOR panel.

## IV. FACTUAL BACKGROUND

### A. The British Bankers' Association

The British Bankers' Association (the "BBA"), according to its own website, is the "leading trade association for the UK banking and financial services sector." The BBA is an association of 200 member banks from 60 countries regarding the "full range of UK and international banking issues." The most important function performed by the BBA is the daily setting of the London Interbank Offered Rate.

### B. LIBOR

24. LIBOR is an acronym for the London Interbank Offered Rate, meaning the rate of interest that would be paid on a loan from one bank to another.

25. LIBOR was developed in the 1980s because banks were looking for a benchmark rate that would allow them to set rates on loans that would minimize the risks to banks of changing market interest rates. By pegging lending rates to LIBOR, which is supposed to represent the rate at which banks themselves could borrow money, banks sought to guarantee that the rates they charge their customers would never fall below their own cost of borrowing money.

26. LIBOR is one of the most important and widely used financial baselines. LIBOR anchors financial contracts totaling more than $300 trillion – the equivalent of $45,000 for every human being on the planet.[2] More than $10 trillion of loans are indexed to LIBOR.

27. The LIBOR rates are computed daily according to a survey administered by the British Banking Association to a fixed panel of sixteen large banks. This survey asks each of the banks the following question:

> At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11 a.m. London time?

The four largest and the four smallest rates are excluded, and the average of the remaining eight rates determines that day's LIBOR rate. It is important to note that the survey asks at what rate the banks *could* borrow money, not at what rates they *have* borrowed money, thus injecting subjectivity and speculation into this important process. As Credit Suisse interest rate strategist William Porter was quoted as stating, "There's no underlying transaction actually done at Libor, so its inherently subjective, and yet it fixes the interest rates on a large proportion of the world's interest-rate contracts."[3]

### C. The Defendants Had Incentive to Minimize LIBOR Rates

28. There are a couple of reasons that a bank might wish to mis-report its borrowing costs to the BBA to understate its true borrowing costs. First, in times of economic uncertainty, a bank might have the incentive to under-report its true borrowing cost in order to appear more financially robust than it actually is. If the bank's true borrowing costs were significantly higher than other banks, it would reveal to the market that the bank had financial troubles.

29. Secondly, the widespread use of LIBOR as the baseline rate for lending gives a bank that is a "net borrower" at LIBOR-based rates (a bank that has borrowed more money

---

[2] Donald MacKenzie, "What's in a number? The importance of LIBOR", *real-world economics review*, issue no. 47, 3 October 2008, pp. 237-242.

[3] Taylor, "Libor Credibility Questioned as Credit Crunch Deepens," *The Telegraph*, April 17, 2008.

indexed to LIBOR than it has loaned at LIBOR-related rates), an incentive to understate LIBOR to increase its own profitability.

D. **Overview of Derivative Contracts Based on LIBOR**

30. Both the Chicago Mercantile Exchange ("CME") and the Chicago Board of Trade ("CBOT") have been designated as a contract market by the Commodities and Futures Trading Commission ("CFTC") pursuant to the Commodities Exchange Act ("CEA"). In 2007, the CBOT and CME merged to form the CME Group.

31. Derivative securities, commonly known as "derivatives", are an important component of the financial markets. Derivatives are securities whose prices are determined by, or "derive from", the prices of other securities or financial indexes. Options and forward contracts (which include futures and swaps) are two types of derivatives. The value of certain options, futures and swaps are determined, at least in part, by the LIBOR rate published by the BBA.

32. "Options" are derivative contracts that give the holder of the option the right to either purchase an asset at a particular price (Call Option) or to sell an asset at a particular price (Put Option) for a particular period of time.

33. "Forward contracts" are similar to options in that they specify the purchase or sale of some underlying asset at some particular future date. The primary difference between futures and options is that while the option holder is not compelled to buy or sell, the holder of a futures contract *must* buy or sell the asset at the close of the time period.

34. Swaps are a particular type of forward contract that allow the holder to exchange cash flows related to one instrument for the cash flows related to another instrument for a particular period of time. For example, if a person thought that interest rates might rise in the future, he would enter into a swap that would give him the cash flows related to a variable bond while he would agree to pay the cash flows related to a fixed-rate bond. Thus, changes to the LIBOR rate are a key determinant in whether such a swap is profitable or unprofitable for the investor.

## V. MISCONDUCT BY THE DEFENDANTS

35. As described above, the Defendants had both the motive and the opportunity to understate LIBOR by providing misleading information about their true borrowing costs to the BBA, which, in turn, would manipulate LIBOR artificially downward.

36. Beginning in early 2006, the Defendants intentionally created and caused to be created artificial LIBOR rates, including artificially low LIBOR rates.

37. For example, from January 14, 2008, through April 16, 2008, LIBOR was understated by at least 20 basis points.[4,5] In their paper, Mr. Hartheiser and Mr. Spieser set forth various methods of calculation of what an accurate LIBOR should have been, based upon various regression models and forecasts of LIBOR using Treasury Bills, the Repo rate and other similar measures.

38. This understatement of LIBOR can only be explained by a cartel of the Defendants determined to understate LIBOR. In fact, a Wall Street Journal article which examined the borrowing costs reported to the BBA by the Defendants from January 2008 through April 2008, showed that the banks reported virtually identical borrowing costs, despite the fact that certain of the banks were in extreme financial distress, as compared to some of the more stable banks. Because the riskiness of the bank is an important factor in determining the rate that the bank can obtain loans, it is simply unbelievable that these reported borrowing costs were accurate. For example, the three-month borrowing rates reported by the Defendants during the first four months of 2008 remained, on the average, within a range of 0.06 of a percentage point. As the WALL STREET JOURNAL quoted Stanford professor Darrell Duffie, these reported rates are "far too similar to be believed."[6]

39. During this period, banks with extremely different risk profiles often reported the ability to borrow at identical or nearly identical rates.

---

[4] Hartheiser and Spieser, "Libor Rate and Financial Crisis: Has the Libor Rate Been Manipulated?"

[5] A basis point or "bps" is 1/100 of one percent.

[6] Mollenkamp and Whitehouse, "Study Casts Doubt on Key Rate," *Wall Street Journal* (May 29, 2008), p. A1.

40. Even the money market committee of the Bank of England raised questions about the believability of LIBOR during the Class Period. In November of 2007, minutes of a meeting of this committee disclosed that "several group members thought that Libor fixings had been lower than actual traded interbank rates through the period of stress." Again, the April 3, 2008 minutes stated that "U.S. Dollar LIBOR rates had at times appeared lower than actual traded interbank rates."

41. After being appraised of numerous complaints about the veracity of LIBOR, the BBA stepped in on April 16, 2008, and warned member banks that anyone found misquoting rates would be removed from the survey. Over the next two days, three month LIBOR rose 18 basis points, the largest percentage increase since the market turmoil began in August 2007.

42. The April 16, 2008 edition of the WALL STREET JOURNAL reported that an interest rate strategist at Defendant Citibank had admitted that LIBOR was over stated by as much as 30 basis points:

> In a recent research report on potential problems with LIBOR, Scott Peng, an interest-rate strategist at Citigroup, Inc. in New York, wrote that "the long term psychological and economic impacts this could have on the financial markets are incalculable." <u>Mr. Peng estimates that if banks provided accurate data about their borrowing costs, three-month LIBOR would be higher by as much as 0.3 percentage points</u>.

This is a remarkable admission on behalf of a Citigroup interest rate strategist, particularly given the fact that Citibank was among the lowest quotes submitted to the BBA a vast majority of the time during the Class Period.

43. On May 29, 2008, BLOOMBERG NEWS reported that a strategist at Barclay's also admitted that banks "routinely" misstated borrowing costs to the BBA:

> Banks routinely misstated borrowing costs to the British Bankers' Association to avoid the perception they faced difficulty raising funds as credit markets seized up, said Tim Bond, a strategist at Barclays Capital.
>
> "The rates the banks were posting to BBA became a little bit divorced from reality," Bond, head of asset-allocation research in London, said in a Bloomberg Television interview.

This article continued by describing how one LIBOR-setting bank (Defendant UBS) submitted rates that were highly implausible in light of its financial troubles:

> As well as varying from member to member, rates show little correlation to banks' costs or insuring debt from default. UBS AG, whose default-insurance costs rose 919 percent between July 2 and April 15 as it racked up $38 billion of writedowns and losses, quoted dollar-borrowing costs that were lower than its rivals on 85 percent of the days during that period, Bloomberg data shows.

44. Also on May 29, 2008, the WALL STREET JOURNAL reported that its investigation had concluded that LIBOR had been materially understated by improper submissions made to the BBA by the Defendants:

> The Journal analysis indicates that Citigroup, Inc., WestLB, HBOS PLC, J.P. Morgan Chase & Co. and UBS AG are among the banks that have been reporting significantly lower borrowing costs for the London interbank offered rate, or Libor, than what another market measure suggests they should be.

The Journal's analysis reported that Defendants Citigroup's submissions to the BBA were 87 basis points lower than the rate should have been, based upon its calculations using default-insurance market data as a basis for its calculations. Likewise, Defendant WestLB's submissions averaged 70 basis points lower than the Journal's calculations suggest were accurate, and Defendants HBOS, J.P. Morgan and UBS' submissions were between 42 and 57 basis points too low.

## VI. GOVERNMENTAL INVESTIGATIONS

45. Several governmental agencies, including the U.S. Commodity Futures Trading Commission have commenced investigations into the LIBOR reporting practices of the Defendants during the Class Period.

46. The fact that government investigations had been commenced did not come to light until March 15, 2011, when Defendant UBS disclosed in its annual report that it had received subpoenas from the Commodity Futures Trading Commission as well as a request for information from the Japanese Financial Supervisory Agency related to its LIBOR submissions to the BBA.

## VII. FRAUDULENT CONCEALMENT

47. Throughout and beyond the conspiracy, Defendants affirmatively, actively and fraudulently concealed their unlawful conduct from Plaintiffs and the Class. Defendants conducted their conspiracy in secret and kept it mostly within the confines of their higher-level executives. Defendants publicly provided pretextual and false justifications regarding their role in setting the LIBOR rates and their true cost of borrowing. Defendants conducted their conspiracy in secret, concealed the true nature of their unlawful conduct and acts in furtherance thereof, and actively concealed their activities through various other means and methods to avoid detection.

48. Plaintiffs did not discover, and could not have discovered through the exercise of reasonable diligence, that Defendants and their co-conspirators were violating the antitrust laws and the Commodities Exchange Act as alleged herein until shortly before this litigation was commenced.

49. As a result of the concealment of the conspiracy by Defendants and their coconspirators, any and all applicable statutes of limitations otherwise applicable to the allegations herein have been tolled.

## VIII. THE CONDUCT HAD AN EFFECT ON U.S. COMMERCE

50. Each of the Defendants was aware that their misconduct in setting an artificially low LIBOR rate would have a direct, substantial and reasonably foreseeable effect on the price of Exchange Traded Libor-Based Derivatives.

## IX. CLASS ACTION ALLEGATIONS

51. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3), individually and on behalf of themselves and all persons or entities (the "Class") who purchased or sold Exchange Traded Libor-Based Derivatives during the period from January 1, 2006, through December 31, 2009 (the "Class Period").

52. This action is properly maintainable as a class action for the following reasons:

(a) The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through discovery, Plaintiffs believe that there are hundreds of members of the proposed Class, who may be identified from records maintained by the Defendants and/or may be notified of this action using the form of notice customarily used in class actions;

(b) Plaintiffs are committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature. Plaintiffs' claims are typical of the claims of the other members of the Class, and Plaintiffs have the same interests as the other members of the Class. Accordingly, Plaintiffs are adequate representatives of the Class and will fairly and adequately protect the interests of the Class;

(c) The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants, or adjudications with respect to individual members of the Class would, as a practical matter, be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; and

(d) A class action is superior to all other methods for a fair and efficient adjudication of this controversy. There will be no difficulty in the management of this action as a class action. Furthermore, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.

53. There are questions of law and fact which are common to the Class and which predominate over questions affecting any individual class member. The common questions include, *inter alia*, the following:

(a) Whether Defendants and their co-conspirators engaged in an agreement, combination, or conspiracy to fix, raise, elevate, maintain, or stabilize prices of LIBOR;

(b) The identity of the participants of the alleged conspiracy;

(c) The duration of the conspiracy alleged herein and the acts performed by Defendants in furtherance of the conspiracy;

(d) Whether the alleged conspiracy violated Section 1 of the Sherman Act, 15 U.S.C. §1;

(e) Whether the conduct of Defendants and their co-conspirators, as alleged in this Complaint, caused injury to the business or property of the Plaintiffs and the other members of the Plaintiff Class;

(f) The effect of Defendants' alleged conspiracy on the LIBOR rate during the Class Period; and,

(g) The appropriate class-wide measure of damages.

## Count I
### (For Violation of Section 1 of the Sherman Act)

54. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

55. Beginning at a time presently unknown to Plaintiffs, and continuing through the present, the exact dates being unknown to Plaintiffs, Defendants and their co-conspirators entered into a continuing agreement, combination and conspiracy in restraint of trade to artificially lower, fix, maintain, and/or stabilize the LIBOR rate, in violation of Section 1 of the Sherman Act, 15 U.S.C. §1.

56. The contract, combination or conspiracy has resulted in an agreement, understanding or concerted action between and among the Defendants in furtherance of which the Defendants fixed, lowered, maintained, and/or stabilized the LIBOR rate. Such contract, combination, or conspiracy constitutes a *per se* violation of the federal antitrust laws and is, in any event, an unreasonable and unlawful restraint of trade.

57. The Defendants' contract, combination, agreement, understanding or concerted action with the co-conspirators occurred in or affected interstate commerce. The Defendants' unlawful conduct was through mutual understandings, combinations or agreements by, between

and among the Defendants and other unnamed co-conspirators. These other co-conspirators have either acted willingly or, due to coercion, unwillingly in furtherance of the unlawful restraint of trade alleged herein.

58. The contract, combination or conspiracy has had the effect, among others, of misstating LIBOR as lower than it otherwise should have been, thus directly impacting the value of LIBOR-related derivatives.

59. As a proximate result of the Defendants' unlawful conduct, Plaintiffs and Class members have suffered injury in that the value of the LIBOR-related derivatives they owned was less than it should have been, had LIBOR been accurately calculated and stated.

## Count II
### (For Violation of the Commodity Exchange Act)

60. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

61. By their intentional misconduct as alleged herein, the Defendants each violated Section 9(a)(2) of the CEA, 7 U.S.C. § 13(a)(2), and caused prices of Exchange Traded LIBOR-Based Derivatives to be artificially increased or decreased during the Class Period.

62. Defendants' manipulation of LIBOR constituted market manipulation of the prices of Exchange Traded LIBOR-Based Derivatives in violation of Sections 9(a) and 22(a) of the CEA, 7 U.S.C. §§ 13(a) and 25(a).

63. Defendants' conduct deprived Plaintiffs and the other Class Members of a lawfully operating market during the Class Period.

64. Plaintiffs and the other Class Members that traded in Exchange Traded LIBOR-Based Derivatives during the Class Period transacted their trades at artificial and unlawful prices resulting from Defendants' misconduct in violation of the CEA, and as a direct result, sustained injury and suffered damages.

65. Plaintiffs and the other Class Members are each entitled to damages for the violations of the CEA alleged herein.

## Count III
### (For Vicarious Liability)

66. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

67. Each Defendants is liable under Section 2(a)(1)(B) of the CEA, 7 U.S.C. § 2(a)(1)(B), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

## Count IV
### (For Aiding and AbettingViolation of the Commodity Exchange Act)

68. Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

69. Defendants knowingly aided, abetted, counseled, induced and/or procured the violations of the CEA alleged herein. Defendants did so knowing of each others' manipulation of LIBOR, and willfully intended to assist these manipulations, which resulted in Exchange Traded LIBOR-Based Derivatives trading at artificial prices during the Class Period, in violation of the CEA, 7 U.S.C. § 25(a)(1).

## X. RELIEF REQUESTED

**WHEREFORE**, Plaintiffs pray for relief and judgment, as follows:

A. Declaring this action properly maintainable as a class action and certifying Plaintiffs as Class representatives;

B. Awarding compensatory and/or rescissionary damages in favor of Plaintiffs and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D. Such other relief as the Court may deem just and proper.

## XI. JURY DEMAND

Plaintiffs demand a trial by jury on all claims so triable.

DATED: April 22, 2011

        HAGENS BERMAN SOBOL SHAPIRO LLP

        by   /s/ Steve W. Berman
           Steve W. Berman
           Karl P. Barth
        1918 Eighth Avenue, Suite 3300
        Seattle, WA 98101
        Telephone: (206) 623-7292
        Facsimile: (206) 623-0594
        steve@hbsslaw.com
        karlb@hbsslaw.com

        Elizabeth A. Fegan
        HAGENS BERMAN SOBOL SHAPIRO LLP
        1144 W. Lake Street, Suite 400
        Oak Park, IL 60301
        Telephone: (708) 628-4949
        Facsimile: (708) 628-4950
        beth@hbsslaw.com

        *Counsel for Plaintiffs and the Proposed Class*